UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
THOMAS LALLY,                           )
                                        )
        Petitioner,                     )
                                        )
v.                                      )        Civil No. 17-10834-LTS
                                        )
JOSEPH MURPHY,                          )
                                        )
        Respondent.                     )
_____)

MEMORANDUM AND ORDER ON PETITION
FOR WRIT OF HABEAS CORPUS (DOC. NO. 1)

July 19, 2018

SOROKIN, J.

        Thomas Lally, a prisoner at the Old Colony Correctional Center in Bridgewater,

Massachusetts, has filed a counseled petition for a writ of habeas corpus pursuant to 28 U.S.C.

§ 2254, in which he raises a number of challenges to his conviction and sentence.  His claims

relate to various perceived deficiencies by his attorney and related due process violations.  The

respondent has opposed the petition, arguing none of Lally's claims merit relief.  For the reasons

that follow, the petition is DENIED.

I.      BACKGROUND

        On March 16, 2006, following an eleven-day jury trial in Norfolk County Superior Court,

Lally was convicted of first-degree murder and received a life sentence.  Doc. No. 1 at 1-2;[1] Doc.

---

[1] Citations to documents on the Court's electronic docket reference the assigned docket number
and the page number from the ECF header at the top of each page.

No. 1-1 at 1; accord Commonwealth v. Lally, 46 N.E.3d 41, 45 (Mass. 2016); S.A. at 8.[2]  The

charges stemmed from the killing of eighty-four-year-old Marina Calabro in her home on

December 19, 2001.  Lally, 46 N.E.3d at 45.  The Supreme Judicial Court ("SJC") summarized

"the facts as the jury could have found them" at Lally's trial as follows:

> The night before the murder, [Lally] slept at the victim's house with two friends,
> Jason Weir and the victim's great-nephew, Anthony Calabro . . . who had moved
> in with the victim the summer before the murder.  Anthony was an intended
> beneficiary of her estate when she died.
>
> Weir was sixteen . . . , four years younger than [Lally] and two or three years
> younger than Anthony.  Both Weir and [Lally] . . . desired to move out of their
> parents' homes.  During the fall of 2001, [Lally] stayed at the victim's house
> approximately five nights per week and Weir stayed there on the weekends.
>
> [Lally] often commented about how he and Anthony could kill the victim and get
> her money.  Specifically, [Lally] said, "Wouldn't it be funny if we pushed her down
> the stairs and got her money?"; "We can kill her and no one would find out"; and
> that he could "knock her over the head with a blunt object and then place her at the
> bottom of the stairs to make it look like an accident."  [Lally] referred to the victim
> [using obscene terms].
>
> On the [afternoon] of the murder, . . . [Lally] obtained the victim's frying pan and
> told Weir, "Today's the day."  Anthony went outside with [Lally's] dog.  The victim
> . . . scolded [Lally] for taking her things without asking [and] put the frying pan in
> the pantry.  [Lally] retrieved it and then used it to hit her on the head.  Next, he hit
> her on the head with a tea kettle, put his hand over her mouth and nose to suffocate
> her, and said, "Just go.  Anthony wants it this way."
>
> Weir testified that he did not assist the victim because he was afraid, "freaking out,"
> and crying.  [Lally] told him, "We all wanted this house," and "we're in it together"
> . . . .  At [Lally's] urging, Weir helped move the victim down the front stairs, which
> were infrequently used. . . .  The trio got in [Lally's] vehicle and Anthony drove
> Weir home.  During the ride, [Lally] said that they needed to "bury the stuff"—
> referring to the frying pan and tea kettle used in the attack, and [other items] from
> the victim's house—at Meadowbrook Pond in Norton.
>
> Anthony and [Lally] later returned to the victim's home; just before midnight, a
> 911 call was placed reporting that an elderly woman had fallen down.  When the
> police arrived, the deceased victim was lying at the bottom of the stairs.  Anthony
> and [Lally] were upstairs in the victim's home.  [Lally] had a welt on his nose, fresh

---

[2] The respondent has filed a Supplemental Answer (cited as "S.A.") containing the state-court
record in five bound volumes.  Doc. No. 20.

scratch marks on his right cheek, and a bite mark on his arm. He explained to police that he received the injuries during a fight with Anthony the prior evening.

A State police trooper noted suspicious circumstances in connection with the claim that the deceased had fallen down the stairs . . . . Conversely, there were conditions consistent with a fall . . . . He requested a full autopsy.

The medical examiner performed a rape kit to help to determine the cause of death, which included taking . . . DNA samples . . . and fingernail clippings and scrapings. . . . After determining that the majority of the victim's injuries were consistent with a fall, he ruled the cause of death as blunt neck trauma and the manner of death as "fall down stairs."

[Lally] told Weir, "We fooled everybody," and told another friend that it was a "perfect crime." He gave friends varying explanations for the scratches on his face, telling some that he received the scratches during a fight with Anthony and others that his dog scratched him.

In March 2002, Anthony wrote two checks totaling $5,000 to [Lally] and two checks totaling $8,000 to Weir. He also purchased a truck for [Lally] and . . . equipment for a band that Weir was in. The three regularly stayed at the victim's home until shortly before it was sold, in July, 2002. Anthony received approximately $250,000 in proceeds from the sale.

In the summer of 2002, Weir was with a friend near Meadowbrook Pond and saw the frying pan, the tea kettle, [and other items] out in the open. After telling [Lally] . . . the two went to Meadowbrook Pond and [Lally] threw the objects in the water.

In October, 2002, Weir's close friend, James Morel, commented that it was a "coincidence that [the victim] wound up the same way [Lally] said she was going to." Weir then told Morel about the murder. Morel alerted the Norton police . . . [and] agreed [to wear a wire when he next met with Weir]. . . . [T]he police followed them for three hours and recorded the pertinent parts of their conversation.

During the meeting, Weir told Morel that [Lally] had killed the victim, and although he helped move the body and clean up, he did not participate in the killing. Weir guided Morel to Meadowbrook Pond and pointed to the location where the items were disposed of after the murder. Morel later accompanied police to the pond and the police recovered [items including] the top of a tea kettle . . . . Subsequently, the police drained the pond and found a tea kettle and a bent frying pan.

Based on this information, Weir and [Lally] were arrested . . . and charged with murder . . . . Weir agreed to cooperate with police in exchange for having his charge reduced . . . .

DNA profiles for [Lally], Weir, Anthony, and Morel were compared to male DNA found on three samples from the victim's rape kit . . . . In the initial testing, all four were excluded as contributors to [one sample], which had been contaminated with

male DNA from the State police crime laboratory. Weir, Anthony, and Morel were excluded as contributors to the fingernail scrapings and the fingernail clippings, but [Lally] could not be excluded from either.

[Lally] testified that Weir killed the victim and that he received the injuries observed by police the night of the murder when he attempted to intervene on the victim's behalf. His stepsister testified to examples of Weir's behavior that made her nervous and his stepfather testified to numerous arguments between Weir and [Lally].

Id. at 45-48 (footnotes omitted).

The SJC elaborated on the DNA evidence offered at trial:

Jeffrey Hickey, a former DNA analyst with Cellmark Diagnostics . . . analyzed the DNA using two methods. First, he performed PCR testing . . . . Hickey also performed Y-STR testing, which separates male DNA . . . when the analyst is unable to create a primary profile from the mixture of male and female DNA.

From the fingernail scrapings, PCR testing showed that the sample was a mix of male and female DNA, the primary DNA profile was from the victim, a "few secondary types" of DNA were located, and [Lally] "could not be excluded as a potential source" of those secondary profiles. Hickey did not provide statistical information to demonstrate the relevance of this nonexclusion PCR evidence, explaining that Cellmark does not provide statistics on secondary profiles.

From the fingernail clippings, PCR testing was inconclusive . . . . Once Hickey extracted only the male DNA, however, he was able to produce a Y-STR profile containing twelve regions of DNA. He testified that the male profile created from Y-STR testing "came back to match [Lally] at all of those regions that we tested." Hickey provided context for this result through statistical analysis, wherein he compared the results of the Y-STR testing to a database of known DNA profiles and determined that the profile occurred in one out of 1,311 Caucasian males, and zero out of 1,108 African-American males, and zero out of 894 Hispanic males. He explained that Y-STR statistics are "quite different" from PCR results—where you can see numbers in the "billions [or] trillions." In PCR testing, "a match across all of those regions" would allow an expert to opine with a reasonable degree of scientific certainty that a DNA profile belongs to a specific person. Conversely, with Y-STR testing, DNA results cannot discriminate among members of the same paternal line and the statistical likelihood is never any greater than the database available for comparison.

Hickey also testified to contamination of [another sample from the victim's rape kit test by a male employee at the state crime laboratory]. . . .

Trial counsel's cross-examination of Hickey focused on the contamination and Hickey's testimony at trial that [Lally] "matches" the Y-STR profile, noting that

Hickey stated in his report that [Lally] could not "be excluded" as a source of the DNA in the fingernail scrapings, not that there was a match. . . .

The prosecutor commented on the DNA evidence in her opening statement and closing argument. In her opening statement, she told the jury that the evidence would prove that [Lally] was the "major contributor" to the right fingernail clippings . . . . In her closing, she argued that . . . the reference to nonexclusion was a matter of "semantics," because Cellmark does not "use the term 'match'" for Y-STR testing, but "if you look at it, you'll see all the numbers from [Lally] correspond to the fingernail clippings."

Id. at 48-50.

Lally's timely direct appeal was stayed by the SJC pending resolution of a June 2010 motion for a new trial. Doc. No. 1-1 at 1; S.A. at 9, 15-16. The trial court held an evidentiary hearing featuring testimony by trial counsel and two DNA experts, as well as oral argument on Lally's claims. Lally, 46 N.E.3d at 50; Doc. No. 1-1 at 2. The SJC summarized the post-trial testimony with respect to DNA evidence this way:

Dr. Michael J. Bourke, a forensic scientist retained in 2005 by trial counsel and in 2009 by postconviction counsel . . . [testified] that [he] alerted trial counsel in a pretrial memorandum to the lack of statistics [supporting the PCR evidence from the fingernail scrapings], advised that "the correct statistic to perform on mixed samples is the combined probability of inclusion," and questioned the admissibility of such evidence without statistics. The memorandum noted that the statistical information was important because the "small to limited number of loci . . . , and the fact that these loci are mixtures, will result in very modest random match probabilities." [Former Cellmark laboratory director Dr. Robin] Cotton likewise testified that testing only a "few" loci could provide probabilities that are "very much smaller" than the large numbers calculated using a full profile. She also testified that statistical information could have been provided at the time of the 2006 trial if requested; however, the information was not routinely provided when the applicable report was written.

. . . The [Y-STR] results were presented [at trial] using . . . "the counting method," which describes the frequency in which a DNA match is found in a given database. A "confidence interval" adjusts that result to account for sampling errors and identical profiles being passed through a paternal line, and thus increases the likelihood that the same profile could be found in a population. . . . Bourke testified that the counting method results "would be misleading without the confidence interval correction." He did not advise counsel about Y-STR deficiencies, but testified that he would have had he been asked. Cotton testified that a confidence interval could have been calculated at the time of trial, but Y-STR testing was in its

infancy at the time of the 2005 report and Cellmark's policy did not provide for
such a calculation.

Lally, 46 N.E.3d at 50-51.

The trial court denied Lally's motion.  See generally Doc. No. 1-1 at 1-36.  The SJC

consolidated Lally's direct appeal with his appeal of the denial of his motion for a new trial, and

affirmed on March 3, 2016 in a published decision.  See generally Lally, 46 N.E.3d at 45-60.

In his timely federal habeas petition, Lally raises seven claims:

1)      Trial counsel was ineffective, and Lally was denied due process, due to various
        errors related to the use of DNA evidence at his trial;

2)      Trial counsel was ineffective for introducing Weir's prior statements;

3)      Lally's right to a jury trial was violated due to the jury's exposure to Weir's
        unredacted plea agreement, and trial counsel was ineffective for allowing such
        exposure;

4)      Lally was denied due process due to the admission of other bad acts evidence, and
        trial counsel was ineffective for failing to object;

5)      Trial counsel was ineffective in advising Lally to testify;

6)      Trial counsel was ineffective in failing to present surrebuttal evidence regarding
        Lally's prior consistent statements; and

7)      The cumulative effect of trial counsel's errors deprived Lally of his right to
        effective assistance of counsel.

Doc. No. 1 at 5-15; see also Doc. No. 27 at 31-71.  Lally's claims are fully briefed and ripe for

disposition.

II.     LEGAL STANDARDS

        A.      General Habeas Review

Federal district courts may not grant a writ of habeas corpus unless they find that the state

court's adjudication of the petitioner's claims "(1) resulted in a decision that was contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States[,] or (2) resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). In other words, state court decisions merit substantial deference. As the Supreme Court repeatedly has emphasized, such deference results in a federal habeas corpus standard that is "difficult to meet," with the petitioner carrying a heavy burden of proof. Harrington v. Richter, 562 U.S. 86, 102 (2011); accord Cullen v. Pinholster, 563 U.S. 170, 181 (2011); see Burt v. Titlow, 571 U.S. 12, 19-20 (2013) (emphasizing the "formidable barrier" faced by federal habeas petitioner where claims already were adjudicated in state court, and limiting relief to cases of "extreme malfunctions" by state criminal justice systems).

A state court ruling is "contrary to" clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). The state court is not required to cite, or even have an awareness of, governing Supreme Court precedents, "so long as neither the reasoning nor the result of [its] decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002); cf. Richter, 562 U.S. at 100 (stating "§ 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits'" and entitled to deference).

For a habeas petitioner to prevail under this exacting standard, the state court judgment must contradict clearly established holdings of the Supreme Court, not merely law articulated by a lower federal court, and not dicta of any court. Williams, 529 U.S. at 404-05; accord Woods v. Donald, 135 S. Ct. 1372, 1376 (2015) (per curiam); Knowles v. Mirzayance, 556 U.S. 111, 122 (2009); see Glebe v. Frost, 135 S. Ct. 429, 431 (2014) (emphasizing that "circuit precedent does not constitute 'clearly established Federal law'" for purposes of § 2254(d)(1)); cf. Marshall v.

Rodgers, 569 U.S. 58, 64 (2013) (warning against using circuit precedent to "refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced"). Similarly, "habeas relief cannot be granted merely because a state court errs in its application of state law." Sanna v. Dipaolo, 265 F.3d 1, 11 (1st Cir. 2001). Although "a state law or practice that betrays a fundamental principle of justice offends the Due Process Clause" and, thus, "can have constitutional implications" such that a claim under § 2254 arises, "not every error of state law can be transmogrified by artful argumentation into a constitutional violation." Id. at 11-12.

A state court decision constitutes an "unreasonable application" of Supreme Court precedent if it identifies the correct governing legal rule, but "unreasonably applies it to the facts of the particular state prisoner's case." Williams, 529 U.S. at 407-08. When making the "unreasonable application" inquiry, federal habeas courts must determine "whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409. An unreasonable application of the correct rule can include the unreasonable extension of that rule to a new context where it should not apply, as well as an unreasonable failure to extend the rule to a new context where it should apply. Id. at 407. It cannot, however, include a decision by a state court not "to apply a specific legal rule that has not been squarely established by" the Supreme Court. Mirzayance, 556 U.S. at 122. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).

If a state court's decision "was reasonable, it cannot be disturbed" under the standards of habeas review as expressed in § 2254(d). Hardy v. Cross, 565 U.S. 65, 72 (2011) (per curiam); accord Renico v. Lett, 559 U.S. 766, 779 (2010). A showing of clear error is not sufficient for a

habeas petitioner to establish entitlement to relief.  Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003); accord McCambridge v. Hall, 303 F.3d 24, 36-37 (1st Cir. 2002) (en banc).  Rather, relief is available only where a state court's "determination was unreasonable – a substantially higher threshold."  Schriro v. Landrigan, 550 U.S. 465, 473 (2007); accord Brown v. Ruane, 630 F.3d 62, 67 (1st Cir. 2011); see also Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam) (emphasizing that a habeas court "may not overturn a state court decision . . . simply because the federal court disagrees with [it]"); Richter, 562 U.S. at 103 (requiring a petitioner to "show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement").  To succeed under § 2254, then, a petitioner must show that the state court's rejection of his claim was "so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible options."  Sanna, 265 F.3d at 13 (quotation marks omitted); see Teti v. Bender, 507 F.3d 50, 57 (1st Cir. 2007) ("A decision can still be reasonable even if the reviewing court thinks it is wrong . . . .").

A state court's determination of the facts, in light of the evidence before it, "is not unreasonable merely because [a] federal habeas court would have reached a different conclusion in the first instance."  Wood v. Allen, 558 U.S. 290, 301 (2010).  Even if "[r]easonable minds reviewing the record might disagree" about a challenged factual determination, "on habeas review that does not suffice to supersede the [state] court's . . . determination."  Rice v. Collins, 546 U.S. 333, 341-42 (2006).  If there is "evidence in the state-court record [that] can fairly be read to support the [state] court's factual determination," relief under § 2254(d)(2) generally is not warranted.  Wood, 558 U.S. at 301-02.

When applying these standards, federal courts ordinarily must presume that the state court's factual findings are correct, unless the petitioner has rebutted that presumption with clear and convincing evidence. § 2254(e)(1); Miller-El v. Cockrell, 537 U.S. 322, 340-41 (2003); accord Teti, 507 F.3d at 57; see Donald, 135 S. Ct. at 1376 (noting "federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong"); Pike v. Guarino, 492 F.3d 61, 68 (1st Cir. 2007) (discussing the "separate and exacting standard applicable to review of a state court's factual findings"). As the parties note, the relationship between the presumption described in § 2254(e)(1) and the standard for relief described in § 2254(d)(2) is uncertain, with decisions of the Supreme Court and the First Circuit expressly declining to resolve the issue. See Doc. No. 27 at 34-35 (citing cases); see also Doc. No. 35 at 15 (calling "interplay between" the two subparts "unclear"). This Court need not resolve the question, as Lally's claims fail even under the more lenient language of § 2254(d)(2).

B.     Ineffectiveness of Counsel

In order to establish that his counsel was constitutionally ineffective, a defendant must satisfy the two-part test set forth in Strickland v. Washington, 466 U.S. 668 (1984), which provides the "clearly established federal law governing" such claims. Jewett v. Brady, 634 F.3d 67, 75 (1st Cir. 2011). "First, the defendant must show counsel's performance was deficient," which requires showing "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." Strickland, 466 U.S. at 687. "Second, the defendant must show the deficient performance prejudiced the defense." Id. "Unless a defendant makes both showings, it cannot be said that the conviction or . . . sentence resulted from a breakdown in the adversary process that renders the result unreliable." Id. As the

Supreme Court repeatedly has emphasized, "[s]urmounting <u>Strickland</u>'s high bar is never an easy task." <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010); <u>accord</u> <u>Richter</u>, 562 U.S. at 105. This is especially so because habeas review of counsel ineffectiveness claims is subject to a "'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." <u>Titlow</u>, 134 S. Ct. at 13 (quoting <u>Pinholster</u>, 563 U.S. at 190).

Counsel's performance is measured objectively, considering only what is "reasonable[] under prevailing professional norms." <u>Strickland</u>, 466 U.S. at 687-88; <u>accord</u> <u>Premo v. Moore</u>, 562 U.S. 115, 122 (2011). Federal courts must be "highly deferential" and "indulge a strong presumption" that counsel's challenged actions might be considered sound strategy under the circumstances. <u>Strickland</u>, 466 U.S. at 689; <u>accord</u> <u>Mirzayance</u>, 556 U.S. at 124. "It is '[r]are' that constitutionally competent representation will require 'any one technique or approach.'" <u>Pinholster</u>, 563 U.S. at 195 (quoting <u>Richter</u>, 562 U.S. at 106). A strategic choice "made after thorough investigation of law and facts relevant to plausible options [is] virtually unchallengeable." <u>Strickland</u>, 466 U.S. at 690.

To establish prejudice, a defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> at 694; <u>accord</u> <u>Mirzayance</u>, 556 U.S. at 127. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." <u>Strickland</u>, 466 U.S. at 693. To warrant relief, a defendant must show that counsel's errors were "so serious as to deprive [him] of . . . a trial whose result is reliable." <u>Id.</u> at 687.

A "doubly deferential standard . . . applies to a state prisoner's claims in a federal habeas petition that a state court has unreasonably applied the <u>Strickland</u> principles." <u>Jewett</u>, 634 F.3d

at 75. In that context, the "pivotal question" is not whether the petitioner has met the <u>Strickland</u> standard in the first instance, but whether "fairminded jurists would all agree that the [state court's] decision [that he has not met it] was unreasonable." <u>Id.</u> (quotation marks omitted); <u>accord</u> <u>Richter</u>, 562 U.S. at 101. And, because "the <u>Strickland</u> standard is a very general one, . . . state courts have considerable leeway in applying it to individual cases." <u>Jewett</u>, 634 F.3d at 75.

III.    <u>DISCUSSION</u>

The Court notes at the outset that the SJC considered, discussed, and rejected each of Lally's claims on its merits. It analyzed and rejected Lally's assertions of counsel ineffectiveness using a standard of review less rigorous than <u>Strickland</u> or its state counterpart, <u>Commonwealth v. Saferian</u>, 315 N.E.2d 878 (Mass. 1974). <u>See</u> <u>Lally</u>, 46 N.E.3d at 48 (noting "the asserted errors [were not] preserved at trial" and, thus, "giv[ing] the defendant the benefit of a more lenient standard"). In particular, the SJC "focuse[d] more narrowly on whether there was error and, if so, whether any such error was likely to have influenced the jury's conclusion." <u>Id.</u> (quotation marks omitted). That the SJC concluded Lally had not satisfied even this more forgiving standard only amplifies the uphill nature of the battle he faces in this Court, given the deferential federal habeas standard summarized above. None of Lally's claims entitle him to relief under these stringent standards.

A.    <u>DNA Evidence</u>

Lally first claims three categories of error arose from the introduction of DNA evidence at his trial. Specifically, he faults trial counsel for failing to challenge admission of the evidence without appropriate explanatory statistics, he asserts the prosecutor prejudicially mischaracterized the DNA evidence in her opening and closing remarks to the jury (and

criticizes trial counsel for failing to object to such remarks), and he argues trial counsel inadequately challenged the DNA evidence via cross-examination and then mischaracterized it in his own closing argument. Doc. No. 27 at 38-57.

### 1. *Admission of DNA Evidence*

According to Lally, the SJC's conclusion that admission of the DNA evidence did not infect his trial with prejudicial constitutional error was an unreasonable application of Strickland, and "ignored material factual evidence in the record." Id. at 43. Lally characterizes the DNA evidence as "one of the few pieces of physical evidence buttressing Weir's account," and argues that the prejudice flowing from any error in its admission would be "palpable." Id. at 48.

The SJC agreed with Lally that "it was error" under Massachusetts law "to admit the nonexclusion results from the PCR evidence without statistical information providing context for th[ose] result[s]." Lally, 46 N.E.3d at 51. Regardless whether a defense challenge to admission of the evidence would have led to exclusion of the results or admission accompanied by statistics showing the results were not especially powerful, the SJC concluded that trial "counsel's failure to challenge the PCR results satisfied the first prong of the test for ineffective counsel." Id. at 51-52 & n.10. According to the SJC, no such error arose from admission of the Y-STR results, as they were accompanied by "count evidence" which "provided the required context" and "was [not] likely to mislead jurors," even if a different statistic would have been more reliable or more favorable to Lally. Id. at 52-53.

As to whether the erroneous admission of the PCR evidence was prejudicial to Lally, however, the SJC "easily" concluded it was not. Id. at 54. The SJC discerned only "limited value" in the "possibility that the DNA evidence could have come from an unknown third party," where the real dispute between the prosecution and defense at trial was whether Weir or Lally

had killed the victim.  Id. at 54-55.  Furthermore, the SJC assessed that there was "strong corroborative evidence" against Lally—specifically, the fresh scratch marks on his face, his differing explanations for those marks, his statements to others before the crime in which he described killing the victim in a manner closely resembling the method actually used, and his description of the murder afterward as a "perfect crime"—which diminished the importance of the DNA evidence and its likely effect on the jury's verdict.  Id. at 55.

The SJC's analysis was neither an unreasonable application of Strickland, nor did it rest on an unreasonable determination of the facts.  There is no basis in the record for second-guessing the SJC's reasonable determination that evidence of Y-STR testing that had not exculpated Lally was properly admitted.  Unlike the testimony about PCR testing, the Commonwealth's expert described statistics providing some meaningful context for the Y-STR results, even if those statistics were not the sort preferred by Lally's present counsel.  Although the record does contain evidence that some scientific literature at the time of Lally's trial suggested another sort of statistic would provide more powerful or reliable context for Y-STR results, it also contains expert testimony that the statistics provided here were endorsed by other scientific literature during the relevant time period.  It was reasonable for the SJC to conclude, in applying state case law setting the parameters applicable to DNA evidence, that the count method adequately established the Y-STR results were not the sort of one-in-a-million match that jurors might otherwise infer when hearing about DNA testing, especially where the Commonwealth's expert candidly described the limitations of the testing.

Additionally, the SJC reasonably credited and relied upon evidence reflecting that trial counsel sought and considered the guidance of a defense expert regarding DNA evidence, that the expert did not advise counsel of potential challenges to the Y-STR statistics, and that

counsel's strategy was reasonable in light of his understanding of the expert's assessment.  See id. at 54 n.17 (describing trial counsel's correspondence with the defense expert when preparing for trial).  No clearly established federal law supports a finding that trial counsel was constitutionally deficient for relying on such expert guidance and choosing a different strategy in these circumstances.

The SJC's prejudice analysis was likewise reasonable.  That the Y-STR results were admitted without error mitigates any prejudice flowing from improper admission of the PCR results (which similarly excluded Weir, but not Lally, with respect to DNA collected from the same part of the victim's body).  At bottom, this was not a DNA case.  The jury was presented with a choice between two narratives of the crime.  In one, Lally was the killer; in the other, it was Weir.  The Commonwealth offered substantial evidence besides the DNA expert's testimony to corroborate Weir's account implicating Lally.  A number of witnesses testified about inculpatory comments they heard Lally make before and after the crime; no one besides Lally offered comparable testimony implicating Weir.  Only Lally was observed with fresh scratches on his face immediately following the killing, then offered varying explanations as to the source of the scratches (none of which were consistent with his trial testimony).

In this context, Lally has not established that admission of the PCR results amounted to an error so serious that all fairminded jurists would agree he was deprived of a trial whose result was reliable.  Given the "doubly deferential" lens of federal habeas review applicable to Strickland claims, Lally is not entitled to relief on this basis.

### 2. *Comments by the Prosecutor*

Lally similarly argues that the SJC unreasonably determined the facts, and unreasonably applied Strickland and Supreme Court precedent concerning prosecutorial misconduct, when it

ruled that the prosecutor's mischaracterizations of the DNA evidence were not prejudicial. Doc. No. 27 at 50-52. According to Lally, the prosecutor "greatly exaggerated the significance" of the DNA evidence and "deliberately misled the jurors" with respect to that evidence, such that Lally was denied due process. Id.

Here, again, the SJC agreed that the prosecutor had misstated the evidence, improperly "insinuated to the jury" that the DNA "nonexclusion" results were as significant as a "match," and thereby compounded the erroneous admission of PCR results in the first instance. Lally, 46 N.E.3d at 53, 55. This error, however, did not impact the SJC's assessment of prejudice "sufficient[ly] to raise it to a level that would entitle [Lally] to relief." Id. at 55. In support, the SJC noted that trial counsel had not objected to the relevant statements, found that "the judge's instructions mitigated the errors," and viewed the comments as unlikely to have impacted the jury's verdict where the "case did not hinge on the DNA evidence." Id. (quotations marks omitted).

The SJC's conclusion was both legally and factually reasonable. Lally has not established that the SJC misapplied the general principles established by the Supreme Court to mark the line between permissible argument and prejudicial prosecutorial misconduct, e.g., Darden v. Wainwright, 477 U.S. 168 (1986); Donnelly v. DeChristoforo, 416 U.S. 637 (1974); Berger v. United States, 295 U.S. 78 (1935), nor has he shown that the SJC unreasonably determined the facts relevant to such an assessment. The trial court clearly and appropriately instructed the jury that lawyers' statements were not evidence, and that jurors should disregard statements by counsel that differed from their recollection of the evidence. S.A. Vol. V, Tab 11 at 60-61. The record reflects that the relevant comments by the prosecutor were brief and isolated in the context of her statements to the jury, just as the DNA evidence itself occupied

16

only a fleeting portion of the testimony offered at trial.  See id. at 50-52 (reflecting the relevant comments occupied two pages in a closing argument spanning more than twenty-three transcript pages); S.A. Vol. III, Tab 4 at 60-61 (reflecting the relevant comments occupied one paragraph in an opening statement spanning more than nineteen transcript pages); see also S.A. Vol. IV, Tab 7 at 136-81 (reflecting the DNA expert's testimony occupied just over forty-five pages in a trial transcript containing approximately a thousand pages).

And, again, this case did not turn on DNA evidence identifying a perpetrator.  Where jurors essentially were tasked with deciding whether to credit Weir or Lally as to which of them watched as the other killed the victim, and where the Commonwealth presented and argued ample evidence besides the DNA results corroborating Weir's account, Lally has not established that the prosecutor's misstatements (or trial counsel's failure to object thereto) infected his trial with prejudice meriting habeas relief.

### 3.  *Defense Approach to DNA Evidence at Trial*

Lally further argues that his trial counsel was ineffective both in his cross-examination of the Commonwealth's DNA expert and for misstating the DNA evidence in his own closing argument.  Doc. No. 27 at 52-57.  Per Lally, the SJC's rejection of these assertions was based on an unreasonable determination of the facts and an unreasonable application of Strickland.  Id.

The SJC found no error in what it determined was trial counsel's "tactical decision to highlight mistakes in investigation," or in his reliance on information received from his own expert consultant.  Lally, 46 N.E.3d at 53-54.  Noting that probing the DNA expert as Lally now proposes carried with it a risk of emphasizing the fact that Weir was excluded as a contributor to all relevant DNA samples, the SJC concluded that it was not manifestly unreasonable to approach the evidence as trial counsel did.  Id.  The SJC did not separately discuss Lally's

assertion that trial counsel also was ineffective for the manner in which he referenced the DNA testimony during his closing argument, a "cursory" assertion which the trial court rejected in a footnote for the same reasons it (and the SJC) had found no prejudicial misconduct by the prosecutor. Doc. No. 1-1 at 20 n.17; see S.A. at 941-42 (containing a single paragraph challenging trial counsel's closing argument).

The SJC's determination sensibly applied Strickland and rested on a reasonable determination of the facts. This is so for the same reasons already discussed as to Lally's other DNA-related challenges. The DNA evidence was not a key element, let alone the lynchpin, of the case against Lally. A reasonable strategic call could have been made to minimize challenges to it in order to shift focus away from the evidence as a general matter (especially given the fact that it highlighted a distinction between Weir and Lally that did not favor Lally, no matter how weak the probabilities associated with the nonexclusion results were, since Weir was excluded as a source of all samples), briefly argue that the evidence did not establish a "match" in the sense normally assumed when DNA testing is used, and then emphasize other aspects of the case that more strongly favored Lally's defense (such as Weir's credibility problems and problems with the police investigation).[3]

Even if this Court were to find fault with the SJC's determination that trial counsel's cross-examination of the DNA expert was not manifestly unreasonable, Lally's Strickland claim

_____

[3] Indeed, this is essentially what trial counsel did in closing. He referenced the contamination of one sample among alleged investigatory missteps, only briefly (and correctly) noting that although the DNA expert had used the word "match" during his testimony, his report did not state that any of his testing revealed a "match" to Lally. S.A. Vol. V, Tab 11 at 13-18; see S.A. Vol. IV, Tab 7 at 168 (reflecting expert testimony on direct examination that Y-STR testing "came back to match Thomas Lally at all of those regions we tested" (emphasis added)). Having carefully reviewed the relevant testimony and trial counsel's reference to it in closing, the Court finds no basis to conclude the argument mistakenly or misleadingly addressed the DNA testimony, let alone that it supports a colorable claim of counsel ineffectiveness.

still would fail because he has not established prejudice for reasons the Court already has summarized. The expert, on direct examination (despite having used the word "match"), already had explained the limitations on the Y-STR results and how they differ from (and are less powerful than) other types of DNA testing. S.A. Vol. IV, Tab 7 at 170-72. Thus, the jury was not misled into thinking that the evidence established a conclusive match to Lally. Furthermore, with other evidence corroborating Weir's trial testimony implicating Lally, and where the defense was not that some unknown third party had committed the murder, the Court finds Lally has not established a reasonable probability that a different approach to the DNA evidence (or even the complete exclusion of it) would have yielded a different outcome.

Accordingly, Lally's DNA-related challenges—though adeptly briefed—do not entitle him to habeas relief.

B.    Weir's Prior Statements

Next, Lally faults trial counsel for choosing to introduce lengthy audio tapes of Weir's conversation with Morel, rather than simply cross-examining Weir on specific points using transcripts of the conversation or playing only selected excerpts of the tapes. Doc. No. 27 at 57-60. According to Lally, playing the tapes "was shocking" and unnecessary, doing more harm than good by confirming salient portions of Weir's trial testimony (thereby bolstering Weir's credibility) and introducing otherwise inadmissible information detrimental to Lally. Id.

The SJC assessed the audio tapes as having contained information both helpful and harmful to Lally. For example, "the tapes impeached Weir's credibility through specific examples of Weir's prior misconduct that may not otherwise have been admitted," including prior thefts and burglaries, and also "revealed the inflection in Weir's voice when talking about the murder and . . . boasting about his ability to lie." Lally, 46 N.E.3d at 56-57 & n.20. On the

other hand, the tapes contained prior consistent statements made by Weir to a friend that bolstered his credibility, as well a description of Lally suggesting that they murder a "bum."[4]  Id. at 57.  In the end, the SJC credited trial counsel's testimony that "he made a tactical decision to introduce the entirety of the tapes" because "impeaching Weir's version of events was paramount to [Lally's] case," and concluded counsel's "strategic choice . . . was not manifestly unreasonable."  Id. at 56-57.

In so ruling, the SJC neither misapplied Strickland nor unreasonably determined pertinent facts.  Even if trial counsel now believes that, "in hindsight, it may have been helpful to redact portions of the tape," the fact remains that he considered the available options at the time of trial and elected to play the tapes—in spite of the prior consistent statements and the unfavorable statements about Lally—"guided by" his belief that "nothing [was] more important" than "the need to impeach Weir."  Id. at 56 n.19.  Strategic decisions of this nature are "virtually unchallengeable."  Strickland, 466 U.S. at 690.  Besides providing jurors with a chance to hear Weir candidly using his own words to describe his prior criminal conduct (some of which involved dishonesty), his claimed proficiency at lying, and his admitted role as at least an accessory to the killing, the tapes also revealed to jurors the tone with which Weir conveyed this information to a friend: proudly and with bravado, which apparently differed markedly from the tone of his trial testimony and may have given jurors reason to doubt the Commonwealth's depiction of him as a frightened teenager dominated by the older, physically larger Lally.

---

[4] Although this fact, at first glance, appears especially damaging to Lally, the SJC explained that the taped conversation further revealed that Weir (not Lally) was the one to act on the suggestion by assaulting a man on the street.  Lally, 46 N.E.3d at 57.  Not only is that admission damaging to Weir, as the SJC noted, it also may have been interpreted as supporting Lally's trial testimony insofar as it provided another instance in which Lally's callous comments about committing violent crimes resulted in actual violent conduct by Weir (which is essentially what Lally said happened here).

In this context, Lally has not established that trial counsel's calculated decision to impeach Weir using the audio tapes rose to the level of constitutionally deficient performance.

C.     Unredacted Plea Agreement

Lally's third claim centers on the jury's receipt of a copy of Weir's guilty plea agreement containing three references to Weir's obligation to testify truthfully, rather than a copy redacted to comply with an earlier ruling by the trial court that, pursuant to state law, the jury should see only one such reference. Doc. No. 27 at 60-64. Per Lally, this resulted in a violation of his right to a jury trial and demonstrates his trial counsel's ineffectiveness. Id.

Once more, though the SJC agreed that the use of an unredacted copy of Weir's agreement was error (or at least assumed as much, because the Commonwealth did not dispute that the failure to redact was an error), it found no prejudice. Lally, 46 N.E.3d at 57-58. The SJC characterized the two unredacted references to "truthfulness" as "cumulative of the one permissible reference," and highlighted the trial court's "clear and forceful instructions to the jury that it was solely for [them] to determine credibility" and assess the truthfulness of "Mr. Weir's testimony." Id. at 58 (quotation marks omitted).

Here, again, the SJC's determination was reasonable in all respects. Insofar as Lally claims a violation of his right to a jury trial, he has pointed only to Massachusetts common law as support for his argument that one reference to truthfulness was permissible, but two other identical references were not. Doc. No. 27 at 63. He has identified no clearly established federal law imposing a similar requirement. Id. Thus, for purposes of this Court's habeas review, Lally has cited no authority permitting this Court to second-guess the SJC's determination that the unredacted references were cumulative (rather than extraneous).

Moreover, other factors underscore the reasonableness of the SJC's prejudice analysis. Besides the trial court's instructions explicitly emphasizing the jury's duty to assess Weir's truthfulness, the record reflects that the Commonwealth neither highlighted the "truthfulness" requirement of the plea agreement nor argued that it provided a basis for jurors to credit Weir's testimony. In these circumstances, Lally has not shown that the unredacted plea agreement infected his trial with improper vouching, extraneous evidence, or any other form of prejudicial constitutional error, nor has he established that counsel's failure to make the redactions ordered previously by the trial court resulted in prejudice sufficient to satisfy Strickland's second prong.

D.    Other Bad Acts

With his fourth claim, Lally accuses the Commonwealth of improperly attacking his character by offering evidence that he had once used profanity when speaking with the victim's elderly sister-in-law, and that he (along with Weir and Anthony Calabro) had "trashed" the victim's apartment after her death. Doc. No. 27 at 64-66. He also criticizes his trial counsel for failing to object to such evidence. Id.

Having "discern[ed] no error in admission of evidence of the condition of the victim's home and the handling of her personal possessions," and "assum[ing], without deciding, that the admission of [Lally's] statement to the victim's sister-in-law was error," the SJC rejected Lally's constitutional challenges arising from this evidence after concluding that it "could not have had appreciable significance to the jury's verdict in light of the [other] evidence" offered at trial. Lally, 46 N.E.3d at 58-59 (quotation marks omitted). The SJC further noted that testimony about damage to the victim's home after her death equally implicated Weir (the only other person identified to jurors by any witness as the possible killer), and found that a "singular comment"

directed at the victim's sister-in-law added no meaningful prejudice where other witnesses described offensive and obscene comments Lally made about the victim.  Id. at 59.

The SJC's rejection of this claim was based on a reasonable application of Strickland and clearly established federal law regarding prosecutorial misconduct.  Evidence about what Lally and his co-defendants did to the victim's apartment and belongings after her death was arguably relevant to the Commonwealth's theory of motive: to gain possession and control of the victim's home, so that the young men could move away from their parents to reside in an apartment they controlled without the oversight of an elderly woman they apparently found bothersome.  See Lally, 46 N.E.3d at 59 (citing a state court decision applying similar reasoning).  And, although more than one witness testified about this post-crime conduct, the Court's reading of the trial transcript does not support a finding that such evidence was "pervasive" or constituted "piling on," as Lally suggests.  Doc. No. 27 at 66.  As such, the Court cannot conclude that an objection by trial counsel would have resulted in the exclusion of some or all of this testimony; thus, his failure to object was not deficient under Strickland.

Even if the Court were to find that trial counsel should have objected to both categories of "bad acts" evidence, the SJC reasonably determined that it was unlikely such evidence meaningfully impacted the jury's verdict, given the nature and scope of the other testimony jurors heard.  Specifically, the Commonwealth offered evidence that Lally committed "the brutal killing of an eighty-four year old woman in her home," after calling the victim profane names and joking about killing her in various ways during social conversations with multiple friends, and then after the killing undertook "methodical actions to make her death seem accidental."  Lally, 46 N.E.3d at 59.  In sum, the bad-acts evidence at issue provides no basis for habeas relief.

E.    <u>Advising Lally to Testify</u>

Lally's next challenge stems from counsel's advice underlying Lally's decision to testify in his own defense.  Doc. No. 27 at 66-68.  Lally characterizes his testimony as unnecessary, urges that the evidence against him "was not overwhelming," and complains that his testimony "opened the door to [his] prior inconsistent statements" to police being offered by the Commonwealth in rebuttal.  <u>Id.</u>

Viewing this claim as "undermine[d]" by evidence that Lally made an "informed and voluntary decision to testify" after "many conversations" with trial counsel, the SJC found trial counsel's advice to Lally was not manifestly unreasonable "where compelling evidence corroborated Weir's version" of events.  <u>Lally</u>, 46 N.E.3d at 59.

In making this assessment, the SJC reasonably applied <u>Strickland</u>.  Lally contends that putting him on the stand was not "required" or "advisable," Doc. No. 27 at 67-68, but those are not the constitutional standards for determining whether counsel provided effective representation.  The record reflects that, sincerely believing Lally was not the killer, sensibly perceiving that the Commonwealth's evidence against Lally was substantial, and reasonably focused on presenting jurors with an alternative narrative to Weir's testimony, trial counsel made a strategic decision to advise Lally to testify despite recognizing the Commonwealth's ability to respond by introducing his post-arrest statement.[5]  The record also reflects that Lally's decision

---

[5] In addition to being non-binding decisions of lower federal or state courts (and, thus, not clearly established federal law under § 2254), the cases Lally discusses in his brief are plainly distinguishable from what happened here.  Those cases involved trial counsel asking certain discrete and avoidable questions of the defendant which opened the door to specific areas of cross-examination or impeachment by the prosecution, not whether trial counsel erred in permitting the defendant to testify at all.  <u>E.g.</u>, <u>White v. Thaler</u>, 610 F.3d 890, 899 (5th Cir. 2010) (finding counsel's performance deficient based on testimony he elicited about the defendant's post-arrest silence, which invited the prosecution to explore and comment on this otherwise out-of-bounds subject).  Lally, on the other hand, does not identify specific areas of

to testify was made deliberately, after consultation with counsel. The fact that another attorney might have given different advice, or that another strategy might have fared better in retrospect, does not transform a considered decision by trial counsel leading to a voluntary choice by the defendant into error of constitutional proportions.

F.    Surrebuttal

Lally's final standalone claim of counsel ineffectiveness stems from trial counsel's decision not to present surrebuttal testimony by two witnesses who heard Lally state, sometime after the murder, that Weir had killed the victim.[6] Doc. No. 27 at 68-69. Lally argues this testimony should have been pursued and admitted as a prior consistent statement corroborating Lally's trial testimony to counteract the prior inconsistent statements elicited by the Commonwealth on rebuttal. Id.

The SJC summarized trial counsel's post-conviction testimony that he had decided not to call the witnesses at issue because, "based on their trial testimony," he thought they "may be hostile to" Lally, although he "conceded" his decision "was not well thought out." Lally, 46 N.E.3d at 60. The SJC agreed with the trial court's finding that counsel's election to forego surrebuttal was tactical, and "was not manifestly unreasonable." Id.

Notwithstanding counsel's after-the-fact doubts about his chosen approach, Lally has not established that the Constitution required counsel to present the relevant witnesses, let alone that

---

inquiry as having been unreasonable; rather, the entirety of his testimony implicating Weir as the murderer is what opened the door to impeachment with his fundamentally inconsistent post-arrest statement to police.

[6] Both of these witnesses testified during the Commonwealth's case-in-chief. One was subject to voir dire on this subject, outside the jury's presence, in connection with trial counsel's desire to elicit the relevant testimony on the theory that it provided a motive for Weir to implicate Lally. The trial court ruled Lally's "self-serving statements" inadmissible at that time and on that theory, concluding Lally had not established Weir knew about the statements. Lally, 46 N.E.3d at 59 & n.24; S.A. Vol. IV, Tab 5 at 90-101.

the SJC's rejection of this claim was beyond the universe of plausible, credible options.  <u>Sanna</u>, 265 F.3d at 13.  The selection of witnesses is a quintessentially strategic call reserved for defense counsel, who is uniquely steeped in the particulars of the case and the myriad competing considerations impacting such a choice.  As such, a federal habeas court must afford a strong presumption of reasonableness to such a decision.  <u>Strickland</u>, 466 U.S. at 689.  Lally has not come close to overcoming that presumption here.

      G.      <u>Cumulative Ineffectiveness</u>

Finally, Lally argues that "the cumulative devastating effect of counsel's failings" entitles him to habeas relief.  Doc. No. 27 at 69-71.  In rejecting Lally's ultimate challenge, the SJC reasoned:

> Even if we were to agree that all of the challenged evidence should not have been admitted, the Commonwealth presented other substantial evidence corroborating Weir's testimony: the defendant's presence at the victim's home the night of the murder; the scratches on his face and varying explanations for the cause; his frequent precrime references to killing the victim, sometimes stating the exact method that occurred; and his postcrime statement that it was the "perfect crime."

<u>Lally</u>, 46 N.E.3d at 60.

The record simply does not support a finding that Lally's "trial was beset by serious errors from start to finish."  Doc. No. 27 at 70.  As explained above, the SJC reasonably found or assumed only four errors in Lally's trial:  the admission of PCR test results without accompanying statistics, mischaracterizations of DNA evidence by the prosecutor in her opening statement and closing argument, the jury's exposure to an unredacted copy of Weir's plea agreement, and testimony about a profane comment Lally made to the victim's sister-in-law.  None of these errors resulted in the admission of evidence that formed a centerpiece of the case against Lally.  Each concerned a comparatively brief moment in a lengthy trial and was either cumulative of other properly admitted evidence or mitigated by the trial court's clear instructions

to the jury. For the reasons explained above, none of the errors individually resulted in anything close to the level of prejudice required to trigger entitlement to habeas relief, and the SJC's conclusion that no such prejudice arose from their cumulative effect was plainly reasonable in the circumstances of this case.

IV.    <u>CONCLUSION</u>

Considered through the twenty-twenty lens of hindsight, trial counsel's advocacy on Lally's behalf may have been imperfect. Perfection, however, is not what the Constitution guarantees. <u>Yarborough v. Gentry</u>, 540 U.S. 1, 6, 11 (2003). Because his claims fail on their merits, Lally's habeas petition is DENIED.[7]

SO ORDERED.

 /s/ Leo T. Sorokin
United States District Judge

---

[7] As "reasonable jurists" could not "debate whether . . . the petition should have been resolved in a different manner," <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000), no certificate of appealability shall issue. As explained above, the state court evaluated Lally's litany of complaints about trial counsel, as well as the related claims of prosecutorial misconduct and/or trial court error, in a manner that was both reasonable and consistent with federal law, particularly where the case against Lally did not turn on DNA evidence and counsel's strategic decisions fell squarely within the bounds of prevailing professional norms.